IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**THE CONFEDERATED TRIBES OF**                     Civil Case No. 10-130-KI
**THE WARM SPRINGS RESERVATION**
**OF OREGON**, a federally recognized Indian
Tribe,                                                              OPINION AND ORDER

                        Plaintiff,

        vs.

**AMBAC ASSURANCE CORPORATION**,
a Wisconsin corporation,

                        Defendant.


        Mike Dillard
        Josh Newton
        J. Christian Malone
        Karnopp Petersen LLP
        Riverpointe One
        1201 NW Wall Street, Suite 300
        Bend, Oregon  97701-1936

                Attorneys for Plaintiff

Page 1 - OPINION AND ORDER

John F. Neupert, P.C.
Miller Nash LLP
3400 U.S. Bancorp Tower
111 SW Fifth Avenue
Portland, Oregon  97204-3699

   Attorney for Defendant

KING, Judge:

  The Confederated Tribes of the Warm Springs Reservation of Oregon ("the Tribe") filed

this action against Ambac Assurance Corporation ("Ambac"), asserting claims for breach of the

covenant of good faith and fair dealing, negligence, fraud, rescission, and unjust enrichment.

The claims arise out of the Tribe's purchase from Ambac of financial guarantee insurance for

revenue bonds.  The Tribe seeks to rescind the contract and recover its $5.1 million premium, as

well as additional losses incurred as a result of Ambac's credit-rating downgrade in the wake of

the subprime mortgage crisis.

  Before the court is Ambac's Motion to Dismiss the First Amended Complaint (doc. 13)

pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6).  At argument, the court granted

the Tribe's oral motion for leave to amend its Third, Fifth, and Sixth Claims and add a claim for

common law fraud.  The court defers ruling on those claims.  For the reasons that follow, the

court grants Ambac's motion to dismiss with respect to the First, Second, Fourth, Seventh and

Eighth claims.

## SUMMARY OF COMPLAINT

  The Tribe is a co-licensee of the Pelton Hydroelectric Project ("the Project"), comprising

three hydroelectric dams on the Deschutes River along the eastern boundary of the Warm Springs

Reservation. Ambac provides financial guarantee insurance against payment default for public finance obligations, such as revenue bonds.

In 2003, the Tribe issued 30-year hydroelectric revenue bonds ("the Bonds") in the form of taxable auction rate securities ("ARS"), in the amount of $50,000,000, to finance acquisition and improvement costs of the Project. The Bonds' interest rates were set at auctions held every 28 days. If buy orders at an auction were insufficient to purchase all of the Bonds offered for sale at that particular auction, the auction "failed," and the Tribe was required to pay a penalty interest rate of 17%.

A key factor in the marketability of the Bonds was their credit rating, as determined by various credit rating services such as Standard and Poor's ("S&P") and Moody's. A high credit rating increased the probability of successful auctions, resulting in lower interest rates and avoidance of the 17% interest rate triggered by a failed auction.

Before the Tribe issued the Bonds, S&P assigned them its lowest investment grade rating, BBB-. The rating meant limited investor demand and, consequently, a higher interest rate and increased risk of a failed auction.

To sell the Bonds at lower interest rates, improve their marketability, and reduce the risk of a failed auction, the Tribe purchased two financial guarantee insurance policies ("the Policies") from Ambac. On October 10, 2003, the parties entered into an Insurance Agreement, under which Ambac agreed to pay the Tribe's bondholders their regularly scheduled principal or interest payments if the Tribe defaulted, and the Tribe agreed to pay Ambac a non-refundable $5.1 million premium as the "reasonable charge for the transfer of credit risk." Compl. ¶¶ 28-29; Compl., Ex. 1 § 2.02. The Agreement included a merger clause. Compl. Ex. 1 § 6.15.

The Tribe alleges that its only purpose in purchasing the Policies was to use Ambac's AAA credit rating to enhance the credit rating of the Bonds.  Id. at ¶ 30.  Based on its assumption that Ambac's financial guarantee insurance would ensure a AAA credit rating for the life of the Bonds, the Tribe anticipated annual interest savings of approximately $100,000.

The Tribe alleges that during negotiations for the Agreement, Ambac represented that there was little, if any, risk that its long-standing AAA credit rating would be downgraded.  The Tribe further alleges that Ambac did not disclose that it had guaranteed risky structured mortgage-backed securities, including those backed by residential mortgages.  However, Ambac's public Securities and Exchange Commission ("SEC") filings revealed the existence of such investments, discussed the risk involved, and noted that the company's "financial condition would be materially adversely affected by any reduction in its ratings."  Ambac 2002 10-K, at 5, 16-17; see also Ambac 2001 10-K, at 11 ($42.7 billion relating to "mortgage-backed and home equity"); Ambac 2002 10-K (guarantees include approximately $43.7 billion of "structured credit derivatives").  The Agreement did not address Ambac's investments, or the types of risk Ambac could insure.  Nor did it require Ambac to maintain a particular credit rating for the life of the Bonds.

By summer 2007, the rapid decline in housing prices and widespread mortgage defaults led to a collapse of the mortgage-backed securities market, and resulted in a major credit crisis.  On February 29, 2008, Ambac acknowledged in its annual SEC filings that it had guaranteed *subprime* residential mortgage-backed securities.  Shortly thereafter, Ambac stopped underwriting mortgage-backed securities.

In early 2008, the Tribe experienced its first failed Bond auction. Every subsequent auction failed until November 2009. In June 2009, S&P downgraded Ambac's AAA credit rating to BBB. That downgrade and the failed auctions triggered the 17% penalty interest rate on the Bonds beginning July 2009. In November 2009, the Tribe refinanced the Bonds.

On February 5, 2010, the Tribe filed this action against Ambac, seeking to recover its $5.1 million premium payment and the costs incurred as a result of the interest rate increases and refinancing the Bonds. The Tribe asserted the following claims: (1) Breach of Contract–Breach of the Covenant of Good Faith and Fair Dealing; (2) Tortious Breach of the Covenant of Good Faith and Fair Dealing; (3) Oregon Securities Violations; (4) Negligence; (5) Statutory Tort–ORS Chapter 746; (6) Negligence Per Se; (7) Rescission; and (8) Unjust Enrichment. Ambac moved to dismiss the Tribe's First Amended Complaint for failure to state a claim. As discussed, the court has granted the Tribe's oral motion for leave to amend its Third, Fifth, and Sixth Claims to attempt to satisfy the specificity requirements of Rule 9(b). Accordingly, I address Ambac's motion to dismiss only with respect to the First, Second, Fourth, Seventh, and Eighth Claims.

## STANDARDS

On a motion to dismiss under Rule 12(b)(6), the court accepts as true the well-pleaded facts in the complaint, viewed in the light most favorable to the non-moving party. Moss v. U.S. Secret Service, 572 F.3d 962, 967 (9th Cir. 2009). To survive a Rule 12(b)(6) motion, a complaint must contain sufficient factual matter to state a facially plausible claim to relief. Ashcroft v. Iqbal, __ U.S. __, 129 S. Ct. 1937, 1949-50 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 1949.

Page 5 - OPINION AND ORDER

Generally, a Rule 12(b)(6) challenge is limited to the complaint, but the court may consider extrinsic evidence integral to the complaint whose authenticity is not contested. Fields v. Legacy Health System, 413 F.3d 943, 958 n.13 (9th Cir. 2005). The court may also take judicial notice of public documents, including SEC filings. Drelling v. Am. Express Co., 458 F.3d 942, 946 n.2 (9th Cir. 2006).

**DISCUSSION**

I.   Breach of the Covenant of Good Faith and Fair Dealing (First and Second Claims)

The Tribe asserts both contractual and tortious claims for breach of the covenant of good faith and fair dealing, on the ground that Ambac engaged in conduct that deprived the Tribe of the benefit of its AAA credit rating for the Bonds.

Oregon law implies a covenant in every contract that neither party will do "anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Perkins v. Standard Oil Co., 235 Or. 7, 16, 383 P.2d 107, 112 (1963). The covenant does not, however, "vary the substantive terms of a contract." Pollock v. D.R. Horton, Inc.-Portland, 190 Or. App. 1, 12, 77 P.3d 1120, 1127 (2003). Rather, it requires that each party perform "in a way that will effectuate the objectively reasonable contractual expectations of the parties." Id. at 11. "The focus is on the parties' agreed common purpose and justified expectations, both of which are closely related to the express provisions of the contract." Id.

Oregon also recognizes a claim for tortious breach of the duty of good faith and fair dealing, but only where the parties are in a "special relationship." Bennett v. Farmers Ins. Co., 332 Or. 138, 160, 26 P.3d 785, 799 (2001). A special relationship exists where "one party has authorized the other to exercise independent judgment in his or her behalf and, consequently, the

party who owes the duty has a special responsibility to administer, oversee, or otherwise take care of certain affairs belonging to the other party." <u>Conway v. Pacific Univ.</u>, 324 Or. 231, 241, 924 P.2d 818, 824 (1996). A special relationship may also exist where one party has "relinquished control over the subject matter of the relationship to the other party and has placed its potential monetary liability in the other's hands." <u>Id.</u>

The Tribe acknowledges that the Agreement contains no express provision requiring Ambac to maintain a AAA credit rating for the 30-year life of the Bonds. Nevertheless, the Tribe contends that its "objectively reasonable contractual expectations implied a good faith obligation for Ambac to act *fairly* and *reasonably* to maintain its AAA credit rating so that the Tribe would receive the credit enhancement on its Bonds for the life of those Bonds." Pl.'s Memo. 8. This argument is unpersuasive.

Nothing in the Agreement suggests that the parties had a reasonable expectation that Ambac would maintain a AAA credit rating for the life of the Bonds. Indeed, the Agreement makes no reference at all to credit enhancement for the Bonds, Ambac's AAA credit rating, or the importance of maintaining such a credit rating. The Agreement expressly states that the purpose of the Policies was to "insur[e] certain payments" (i.e., principal and interest) to the bondholders in the event of the Tribe's default on the Bonds. Insurance Agreement, Compl. Ex. 1, at 1; <u>see also</u> Bond Policy, Compl. Ex. 2, at 1 ("[I]n consideration of the payment of the premium . . . [Ambac] hereby agrees to pay . . . that portion of the principal and interest on the above-described obligations . . . which shall become Due for Payment but shall be unpaid by reason of Nonpayment . . . ."). Moreover, the Policies expressly disclaim insurance "against . . . any risk other than Nonpayment." Bond Policy, Compl. Ex. 2, at 1; <u>see also</u> Compl. Ex. 4,

Certificate of Bond Insurer, at 1 ("no portion of [the] premium represents a payment for any direct or indirect services other than the transfer of credit risk").  The Tribe's contention that the agreed, common purpose of the financial guarantee insurance was "credit enhancement" (i.e., improving or enhancing the credit rating of the Bonds to Ambac's AAA credit rating for the life of the Bonds) is not supported by any language in the express provisions of the contract.  See Pollack, 190 Or. App. at 11-12.

The Tribe's unilateral and subjective intentions in executing the Agreement do not provide a basis for implying a promise by Ambac to maintain its AAA credit rating.  References in the Tribe's Bond Resolution and Bond Ordinance to "credit enhancement" or "enhanc[ing] the creditworthiness" of the Bonds do not make obtaining a AAA credit rating the agreed common purpose of the Agreement.  The Tribe's Bond Resolution and Bond Ordinance documents are extrinsic to the Agreement, created by the Tribe before the Agreement was executed.

I conclude that implying a promise on the part of Ambac to maintain its AAA credit rating would "vary the substantive terms of [the] contract[,]" and that such a promise was neither the common purpose, nor an "objectively reasonable contractual expectation[] of the parties." Pollock, 190 Or. App. at 12.  Thus, the allegations do not state a facially plausible claim under Iqbal.  The Tribe has failed to state a claim for breach of the covenant of good faith and fair dealing, contractual or tortious.

II.   Negligence (Fourth Claim)

For its Fourth Claim, the Tribe alleges that by issuing risky financial guarantees that jeopardized its AAA credit rating, Ambac created a "foreseeable risk of harm," and did, in fact, injure the Tribe.  Compl. ¶ 57.

A negligence claim for the recovery of economic losses caused by another must be predicated on "some duty of the negligent actor to the injured party beyond the common law duty to exercise reasonable care to prevent foreseeable harm." Onita Pac. Corp. v. Tr. of Bronson, 315 Or. 149, 159, 843 P.2d 890, 896 (1992). Where the

> gravamen of the complaint is that one party caused damage to the other by negligently performing its obligations under the contract, then, and even though the relationship between the parties arises out of the contract, the injured party may bring a claim for negligence if the other party is subject to a standard of care independent of the terms of the contract.

Georgetown Realty v. Home Ins. Co., 313 Or. 97, 106, (1992). Duties outside the common law of negligence may arise from a duty imposed by statute, or from a "special relationship between the alleged tortfeasor and the plaintiff." Loosli v. City of Salem, 215 Or. App. 502, 506, 170 P.3d 1084, 1087 (2007), aff'd, 345 Or. 303 (2008).

The Tribe has failed to state a negligence claim because the Tribe has not alleged a special relationship or independent statutory duty that would give rise to a duty beyond the common law duty to exercise reasonable care. An arm's length commercial transaction does not create the relationship required for a negligence claim. See Onita, 315 Or. at 161 (commercial transaction between two adversarial parties negotiating at arm's length to further their own economic interests does not create the relationship required for a negligence claim).

III.    Rescission–Frustration of Purpose (Seventh Claim)

For its Seventh Claim, the Tribe alleges that its primary purpose in purchasing financial guarantee insurance was "to obtain the AAA credit enhancement for the Bonds," a purpose mutually understood by the parties. Compl. ¶ 68. The Tribe further alleges that this purpose was completely frustrated by the downgrading of Ambac's AAA credit rating, a circumstance that the

parties mutually assumed would not occur.  The Tribe seeks to rescind the contract based on the

frustration of purpose doctrine.

In Oregon, the frustration of purpose doctrine allows rescission of a contract if a party's

mutually understood "principal purpose" in entering into the contract is "'frustrated . . . by the

occurrence of an event the non-occurrence of which was a basic assumption' of the parties."

Chang v. Pacificorp, 212 Or. App. 14, 22, 157 P.3d 243, 248 (2007) (quoting Restatement

(Second) of Contracts § 265 (1981)).  Rescission for frustration of purpose requires a showing

that (1) a particular purpose was the "primary purpose" in entering into a contract; (2) that

purpose was "mutually understood," even if not mutually shared; (3) that purpose was

substantially "frustrated;" and (4) the frustration was the result of circumstances that the parties

"mutually assumed would not occur–and, thus, the risk of the frustrating circumstance was not

impliedly allocated to the party who later seeks rescission." Id.

The Tribe has not alleged facts sufficient to show that mutually understood primary

purpose of the Agreement was to obtain the "AAA credit enhancement for the Bonds."  Compl.

¶ 68.  As discussed, the Agreement is silent with respect to both credit enhancement and

Ambac's credit rating.  The Agreement's express provisions state a purpose of insuring payments

to the bondholders in the event of the Tribe's default.  Insurance Agreement, Compl. Ex. 1, at 1;

see also Bond Policy, Compl. Ex. 2, at 1.  The Policies disclaim insuring against any risk other

than nonpayment, and state that "no portion of [the] premium represents a payment for any direct

or indirect services other than the transfer of credit risk."  Compl. Ex. 4, Certificate of Bond

Insurer, at 1.  As the court said in Chang, "It is not enough that [a party] had in mind some

specific object without which [it] would not have made the contract.  The object must be so

completely the basis of the contract that, as both parties understand, without it the transaction would make little sense."  212 Or. App. at 36 (quoting Restatement (Second) of Contracts § 265, comment a).

The Tribe's rescission claim also lacks any allegation that the parties mutually assumed a downgrade of Ambac's credit rating would never occur.  The doctrine of frustration of purpose "involves the allocation of risks of unexpected occurrences . . . .  If the occurrence is reasonably foreseeable, courts normally take the position that the promisor has assumed the risk of . . . frustration."  Rose City Transit Co. v. City of Portland, 18 Or. App. 369, 423, 525 P.2d 1325, 1352 (1974) (citation omitted).  The Tribe acknowledges that "a risk of a potential Ambac credit rating downgrade was foreseen."  Pl.'s Mem. 6.  In its Offering Memorandum for the Bonds, the Tribe warned potential investors that "[t]here can be no assurance that any [AAA] ratings will be retained for any period of time or that the same will not be revised downward or withdrawn entirely."  Ex. C to Abramis Decl., Offering Mem., at 54.[1]  To hedge the Tribe's long-term risk, the Tribe entered a swap agreement with Citibank, which provided for specific consequences in the event of a credit ratings downgrade.  Compl. ¶ 28; Ex. D to Abramis Decl., ISDA Master Agreement, at 6.  Because the Tribe acknowledges that "a *risk* of potential Ambac credit rating downgrade was foreseen," its frustration of purpose claim fails.  Pl. Mem. 6.

---

[1]The Tribe does not object to the court taking judicial notice of the Offering Memorandum for the Bonds.  Pl.'s Mem. in Response 5-6; see also Swartz v. KPMG LLP, 476 F.3d 756, 763 (9th Cir. 2007) (court may consider matters properly subject to judicial notice on Rule 12(b)(6) motion); Fed. R. Evid. 201(b) (judicial notice appropriate where fact is "not subject to reasonable dispute" and "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned").

IV.    <u>Unjust Enrichment (Eighth Claim)</u>

For its Eighth Claim, the Tribe alleges that under the circumstances of this case, it would be unjust to allow Ambac to retain the Tribe's $5.1 million premium payment.  Ambac counters that because a legally valid, enforceable contract exists, the Tribe is precluded from asserting an equitable claim for unjust enrichment.

Unjust enrichment is a theory of "quasi-contract" based on an implied contract.  <u>Summer Oaks Ltd. P'ship v. McGinley</u>, 183 Or. App. 645, 654, 55 P.3d 1100, 1104  (2002).  Quasi-contract "presupposes that no enforceable contract exists."  <u>Kashmir v. Patterson</u>, 43 Or. App. 45, 48, 602 P.2d 294, 296 (1979).  It is a remedial device the law affords where no enforceable contract exists, but where (1) one party has conferred a benefit on another, (2) the recipient is aware that a benefit has been received, and (3) "under the circumstances, it would be unjust to allow retention of the benefit without requiring the recipient to pay for it."  <u>Summer Oaks</u>, 183 Or. App. at 654.

In Oregon, a party may plead alternative claims for breach of both an express contract and an implied contract:

> Such alternative pleading may be beneficial to the pleader in the situation where it is faced with a contract that may be void under the statute of frauds, where its performance has been hindered by the defendant, where the facts at trial may show that it did not substantially perform the contract but that it is entitled to the reasonable value of the services furnished, or where the pleader is unsure whether it can actually proved the existence of the contract at trial.

<u>Kashmir,</u> 43 Or. App. at 48.  But "[u]ltimately . . . there cannot be a valid legally enforceable contract and an implied contract covering the same services."  <u>Id.</u>

The parties do not dispute the existence of a valid and enforceable contract.  Accordingly, the Agreement precludes the Tribe's unjust enrichment claim.

## CONCLUSION

For these reasons, Ambac's Motion to Dismiss the Tribe's First Amended Complaint (doc. # 13) is GRANTED in part and DEFERRED in part.  The Tribe's First, Second, Fourth, Seventh, and Eighth Claims are dismissed for failure to state a claim.  The court DEFERS ruling on the remaining claims.

IT IS SO ORDERED.

Dated this _____17th_____ day of November, 2010.


   /s/ Garr M. King_____
Garr M. King
United States District Judge